RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0225p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

CODY HENDERSON,

*Plaintiff-Appellee*,

*v.*

VILLAGE OF NEW HOLLAND, OHIO,

*Defendant*,

WILLIAM LAWLESS,

*Defendant-Appellant*.

No. 26-3051

─────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:23-cv-03979—Michael H. Watson, District Judge.

Argued: July 29, 2026

Decided and Filed: August 7, 2026

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Zachary T. Weigel, FREEMAN, MATHIS & GARY LLP, Columbus, Ohio, for Appellant. Connie Gong, WILKINSON STEKLOFF LLP, Washington, D.C., for Appellee. **ON BRIEF:** Zachary T. Weigel, Paul-Michael La Fayette, FREEMAN, MATHIS & GARY LLP, Columbus, Ohio, for Appellant. Connie Gong, Guus Duindam, Dino Hadziahmetovic, WILKINSON STEKLOFF LLP, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

SUTTON, Chief Judge.   This Fourth Amendment qualified immunity case arises from repeat encounters between Cody Henderson and two police officers in New Holland, Ohio.   The district court denied qualified immunity to the relevant officer.   We reverse.

I.

New Holland is a small town in south-central Ohio with a population of about 800.  *New Holland Village, Ohio*, United States Census Bureau, https://tinyurl.com/6tzs254v (last visited Aug. 6, 2026).   One of its residents is Cody Henderson.

Henderson came to New Holland with the hope of expanding his CBD oil business. While visiting a friend's farm near New Holland, Henderson "received a vision" in which he "witnessed the fields full of hemp, blowing in the wind."  R.56-2 at 3.   After Henderson secured a promise of funding from an investor, he left Washington Court House, also in Ohio, and moved to New Holland in 2022 with plans to establish an "Organic Hemp Farm."  R.56-2 at 3.

Not long after Henderson moved to New Holland, he became suspicious of one of the village's police officers, the non-eponymously (we venture) named police chief, William Lawless.   Henderson first noticed Officer Lawless when he saw his police cruiser trailing him as he rode his motorcycle down the village's main street.   When the cruiser turned and drove away, that seemed to be the end of it.   But Henderson did not like being "followed . . . with no reason." R.56-2 at 5.   He decided to turn the tables and opted to follow the police car.   After catching up to the cruiser, Henderson pulled next to it and "began having words" with Officer Lawless. R.56-2 at 5.   Henderson, who is a white Rastafarian, told Lawless that he would "not put up with being profiled, targeted, and harassed in this small town."  R.56-2 at 5.   Before long, another driver sped by, and the officer drove away to perform a traffic stop.

About a week later, on September 13, 2022, Officer Lawless was on patrol with another officer, Darnell Pate.   When a black Prius approached the village "at an excess rate of speed,"

R.54-1 at 2, Officer Pate used a radar gun to clock the car going 47 miles per hour, which exceeded the village's 35-miles-per-hour speed limit. The officers stopped the car and told the driver, Henderson, that he was speeding. Henderson insisted that he had not been speeding. Officer Pate responded that "the side of the road isn't the place to argue." R.56-2 at 6. The officers eventually issued Henderson citations for speeding, not wearing a seat belt, failing to present his driver's license, having an improperly dark window tint, and driving with an expired vehicle registration.

Another week brought another encounter. On September 22, Officers Lawless and Pate saw Henderson driving the same black Prius with the same expired registration tags. They stopped Henderson. Henderson filmed the encounter on his cell phone. When Officer Pate approached the car, Henderson refused to roll the window down more than an inch or two, even after Officer Pate expressed his safety concerns about the dark tinted windows. Officer Pate asked Henderson to step out of the vehicle.

After Henderson exited the car, Officer Lawless told Henderson that he had cited him for expired tags once before and that he had seen Henderson driving the still-unregistered car at another time and gave Henderson a break by not citing him again at that point. Because Henderson still had not updated his registration tags, Officer Lawless told him that he was "not allowed to legally drive" his car until he renewed the registration. R.59 Cell Phone Footage at 0:40–53, 5:00–11. The officers told Henderson that they would have to impound his car until he renewed its registration, and told him to sit on the curb away from the car so they could conduct an inventory search. When the officers began to search the vehicle, Henderson insisted that he did not consent to the search, yelled at the officers, refused to sit down, and walked toward them. At that point, the officers arrested Henderson for "not cooperating" and put him in the back of the police cruiser. *Id.* at 4:10–16.

The inventory search revealed a large black tote locked with a padlock. The officers forced the tote open and discovered large quantities of hemp, CBD, and similar substances. Unsure of the legality of these substances, the officers spoke with a deputy of the Pickaway County Sheriff's Department who had arrived on the scene. At the deputy's suggestion, the

officers called the county prosecutor's office for guidance and received advice to send the materials to a lab for testing.

The officers arrested Henderson for obstruction of official business and brought him to the county jail.  When Henderson tested positive for COVID-19, however, they could not incarcerate him.  They decided instead to release Henderson with a citation.  Henderson received a list of the property contained within his black tote, which remained in police custody along with his car.  Henderson updated his registration and received his car and property back.  The county prosecutors dismissed all of the charges against him, apparently because the substances were all legal forms of hemp.

Henderson filed a lawsuit in federal court against the two officers and the Village of New Holland.  Invoking § 1983, he alleged violations of his rights under the First, Fourth, and Fourteenth Amendments as well as several state-law malicious prosecution, conversion, and civil conspiracy claims.  The court dismissed the claims against Officer Pate, who was murdered in an unrelated incident before Henderson filed the complaint.

After discovery, the defendants moved for summary judgment on qualified-immunity and *Monell* grounds.  The district court granted the motion as to all claims against the Village and most claims against Officer Lawless.  But it allowed the Fourth Amendment and malicious prosecution claims to proceed against the officer.

Officer Lawless appeals the denial of qualified immunity as to the surviving claims. Henderson obtained pro bono appellate counsel, Connie Gong, who skillfully discharged her duties in this case.

## II.

We generally have jurisdiction over an interlocutory appeal from a district court's denial of qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).  "An exception exists for a small number of cases in which the officers premise their appeal solely on challenges to record-supported facts."  *Dannah v. City of Grand Rapids*, 176 F.4th 923, 926 (6th Cir. 2026); *see Johnson v. Jones*, 515 U.S. 304, 313–17 (1995).  Officer Lawless accepts Henderson's version of

the events and raises several legal (hence non-factual) contentions, giving us jurisdiction over his appeal.  *See Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 608 (6th Cir. 2025).

III.

Qualified immunity protects officers from "the time, expense and risk of money-damages actions unless they violate clearly established constitutional rights."  *Moore v. Oakland County*, 126 F.4th 1163, 1167 (6th Cir. 2025) (quotation omitted).   It "reflects the reality" that subjecting officers to money-damages suits for "uncertain violations of the Constitution" would "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties."  *Aaron v. King*, 171 F.4th 822, 826 (6th Cir. 2026) (quoting in part *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019)).

To overcome a qualified immunity defense, Henderson bears the burden of demonstrating that Officer Lawless violated a constitutional right and that the right was clearly established. *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017).  Henderson alleges that Officer Lawless violated his Fourth Amendment rights at three junctures.  Because no constitutional violation occurred at each point, we need not address the clearly established prong of the inquiry.

*Probable cause for the September 13 traffic stop.*  Henderson claims that Officer Lawless violated the Fourth Amendment when he (and Officer Pate) stopped him for speeding on September 13.  The Fourth Amendment protects citizens from "unreasonable . . . seizures."  U.S. Const. amend. IV.  A traffic stop constitutes a "seizure of the occupants of the vehicle," *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quotation omitted), and requires a "reasonabl[e]" basis to justify it, *United States v. Stevenson*, 43 F.4th 641, 644 (6th Cir. 2022).

As a side note, it is not clear what "level of justification" the Fourth Amendment requires before an officer may conduct a stop for a civil traffic violation.  *Id.* at 645; *see Brendlin v. California*, 551 U.S. 249, 263 n.7 (2007) (citing inconsistent Supreme Court precedent on this point); *King v. City of Rockford*, 97 F.4th 379, 391 n.3 (6th Cir. 2024) (noting that our precedent "has been inconsistent").  Some cases say that reasonable suspicion suffices.  *Heien*, 574 U.S. at 60; *Navarette v. California*, 572 U.S. 393, 396–97 (2014); *United States v. Jordan*, 100 F.4th 714, 718 (6th Cir. 2024).  Other cases require probable cause.  *King*, 97 F.4th at 390–91; *United*

*States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016). We need not resolve the point, as the parties agree that the higher standard (probable cause) applies, and we conclude that the officers met that standard.

Probable cause "is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quotation omitted). It requires "only a probability or substantial chance" based on the "totality of the circumstances," *id.* (quotations omitted), that a driver "has committed, is committing, or is about to commit an offense," *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

An officer has probable cause to pull over a driver when he "observes [the] motorist violate a traffic law." *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020). A radar gun offers one way, though not the only way, for an officer to identify a speeding car. Probable cause exists when a radar gun shows that a car exceeds the speed limit. *See United States v. Littleton*, 15 F. App'x 189, 192 (6th Cir. 2001); *United States v. Norton*, 893 F.3d 464, 466–67 (7th Cir. 2018).

One other consideration overlays this inquiry. The Fourth Amendment requires officers to "be reasonable," "not to be perfect." *Heien*, 574 U.S. at 60. Because "reasonable men make mistakes," an officer's misapprehension of a relevant fact or point of law does not defeat a finding of probable cause. *Id.* at 61. So, for example, an officer does not violate the Fourth Amendment if he "stop[s] a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat." *Id.* at 57. Nor does a constitutional violation occur when an officer makes a traffic stop based on his reasonable misunderstanding of traffic regulations. *Id.* at 60–61. An officer's reasonable mistake in conducting a traffic stop, then, does not undermine the existence of probable cause. *Id.* at 61.

Officer Lawless had probable cause to stop Henderson. He saw Henderson driving toward the village "at an excess rate of speed." R.54-1 at 2. He asked Officer Pate to deploy his radar. Officer Pate "confirm[ed]" that Henderson "was traveling in excess of the posted speed limit." R.54-1 at 2. The radar read-out gave the officers a "reasonable ground" to stop Henderson. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation omitted).

Officer Lawless reasonably relied on what the radar gun showed.  No evidence suggests that the radar gun malfunctioned, and Officer Lawless confirmed that Officer Pate "used proper technique" when verifying Henderson's speed.  R.54-1 at 2.  Even if that were not the case, even if the radar gun misfired or the officers somehow measured Henderson just before rather than just after he entered the village, the worst that could be said is that the officers made a mistake in ascertaining Henderson's speed within the city.  But such a reasonable mistake, as shown, does not defeat the existence of probable cause.  *Heien*, 574 U.S. at 60–61.

Henderson resists this conclusion, claiming he slowed down from 47 miles per hour (under the 55-miles-per-hour speed limit outside the village) to 34 miles per hour before he reached the village (under the 35-miles-per-hour speed limit within the village).  His deposition testimony to this effect, he contends, creates a "dueling narrative[]" that undermines Officer Lawless's account and defeats summary judgment.  Appellee's Br. 25.  But a stop "based on mistakes of fact" does not undermine probable cause so long as the mistakes are "reasonable." *Heien*, 574 U.S. at 61 (quotation omitted).  Based on his own visual observations and Officer Pate's radar-gun confirmation, Officer Lawless reasonably found that Henderson violated the town's speed limit.  Even if Henderson is right, even in other words if an error occurred in measuring the speed of Henderson's decelerating vehicle, that mistake does not fall on the unreasonable side of the line.  That means that no Fourth Amendment violation occurred either way.  And that means that he has not created a "genuine dispute" of "material fact" with respect to the officers' probable cause determination.  Fed. R. Civ. P. 56(a).

The question at hand, it is well to remember, is not whether Henderson actually exceeded the New Holland speed limit.  It is whether the officers had probable cause to believe that he did. To constitutionalize a requirement that officers detect a driver's speed with flawless precision would erase the "probable" from "probable cause."  At the same time, that approach would turn a good many speeding tickets into potential § 1983 jury trials in which the officer and driver could provide dueling evidence about whether the driver actually exceeded the posted speed limit.  If you doubt us, ask yourself how many speeding tickets are issued each year to drivers who think they decelerated before they approached a small town with a slower speed limit.  All of this explains why an actual traffic violation need not occur for officers to have probable cause.

*Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). They need only to identify a "substantial chance" that a violation occurred or was about to occur. *Wesby*, 583 U.S. at 51. Probable cause in the end requires just that: probability, not certainty. No Fourth Amendment violation occurred.

*Inventory search on September 22.* Henderson separately challenges the second traffic stop, maintaining the officers violated his Fourth Amendment rights when they searched his car.

The Fourth Amendment generally requires that police obtain a warrant before conducting a search. *United States v. Whitlow*, 134 F.4th 914, 919 (6th Cir. 2025). A "well-defined exception" to this general rule, however, permits inventory searches of an impounded car. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

To fit the exception, the inventory search must have two features. One: a "warrantless inventory search may only be conducted if police have lawfully taken custody of a vehicle." *United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013) (quotation omitted). To impound a car lawfully, the officers must invoke "standard criteria" and "something other than suspicion of evidence of criminal activity." *United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020) (quotation omitted). Two: an inventory search "may not be undertaken for purposes of investigation." *United States v. Jackson*, 682 F.3d 448, 455 (6th Cir. 2012) (quotation omitted). Consistent with the first requirement, the officers must follow "standardized criteria . . . or established routine" to ensure that the search does not become "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). While police departments have discretion in shaping those criteria, an inventory policy or routine should set guidelines regarding whether and when to search a seized vehicle, *Bertine*, 479 U.S. at 375–76, and the permissible scope of the search, *Wells*, 495 U.S. at 3–4. *See United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020).

Through it all, "the question is not whether the policy was complied with to the T." *Hockenberry*, 730 F.3d at 661 (quotation omitted). We do not condition the Fourth Amendment on "mechanical" adherence to police department policies. *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001) (quotation omitted). We instead treat compliance with such policies as one

means of sifting out officers trying to "hide an investigative search under the pretext of an inventory search." *Snoddy*, 976 F.3d at 634. The Fourth Amendment permits an inventory search that does not comply in every way with a police department's guidelines so long as the evidence does not indicate that the officers used the inventory search as an end-run around the Fourth Amendment's probable cause and warrant requirements. *See United States v. Rogers*, 861 F. App'x 8, 16–17 (6th Cir. 2021). As the Supreme Court put the point in rejecting a related claim that the police engaged in a pretextual stop: "[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext." *Whren v. United States*, 517 U.S. 806, 816 (1996).

By these lights, this inventory search satisfied the Fourth Amendment. The officers, to start, lawfully impounded Henderson's car. New Holland's impoundment ordinance permits officers to impound "[a]ny vehicle . . . connected with[] the commission of a crime." R.59-1 at 5. That "standard[ized]" criterion existed here. *Snoddy*, 976 F.3d at 634 (quotation omitted). Driving with an expired registration amounts to a misdemeanor under Ohio law. Ohio Rev. Code § 4503.11(A), (D). There is no better way to ensure compliance with a registration requirement by a repeat offender than to impound his car. The officers had ample reasons to impound Henderson's car based on its expired registration, which they observed at least twice before they seized the car.

The New Holland Police Department's inventory policy sets parameters for when to conduct an inventory search ("[w]hen officers impound a vehicle") and the scope of that search ("always do a COMPLETE physical inventory of its contents"). R.56-8 at 29. The officers followed these requirements.

Henderson objects to this conclusion, first on the ground that Officer Lawless violated the village's inventory policy. The policy requires an officer to list all property found in a vehicle and to make "[t]wo copies" of the resulting written inventory. R.56-8 at 29. While the officers wrote a list of Henderson's property in the car, they made only one copy of it and the copy seemed to include only those objects contained in Henderson's black tote. These policy violations, says Henderson, render the search unconstitutional.

But the imperative of a policy does not make each jot and tittle of it a constitutional imperative. A search that imperfectly complies with department policies still passes muster absent proof that the officers sought to circumvent the Fourth Amendment. *See Hockenberry*, 730 F.3d at 661. That consideration is particularly salient when the violated procedure covers nothing more than after-the-fact paperwork. "The post-discovery listing of items discovered in a search . . . has no pertinent connection to the discovery" of those items and thus may not on its own invalidate an inventory search. *Kimes*, 246 F.3d at 805; *see Hockenberry*, 730 F.3d at 661 (approving of inventory search despite officers "omit[ing] many items from" the written inventory in violation of department policy); *Rogers*, 861 F. App'x at 16–17; *United States v. Mundy*, 621 F.3d 283, 293–94 (3d Cir. 2010).

Nor did the officers misuse the impoundment as a pretext for an illicit investigatory search. The record confirms that Officer Lawless had a perfectly legitimate reason for the impoundment and subsequent inventory search of Henderson's car. Despite serial warnings and one prior citation, Henderson repeatedly drove an unregistered vehicle through the village. After watching Henderson continually flout the law, Officer Lawless fixed the problem in the most direct and easy-to-remedy way: He impounded Henderson's car until he renewed his registration. That amounts to an everyday feature of legitimate law enforcement, not a constitutional violation.

Henderson separately argues that the policy gave insufficient direction over how to conduct an inventory search. In doing so, he points to *Florida v. Wells*, in which the Supreme Court held that a policy does not satisfy the Fourth Amendment if it fails to provide guidance "with respect to the opening of closed containers" found during an inventory search. 495 U.S. at 4–5. New Holland's policy, he adds, did not provide sufficient direction to police officers about whether to open the locked black tote found in Henderson's car.

But "closed containers" are not "buzz words," much less magic words, that a policy must explicitly describe and explicitly address. *United States v. Jackson*, 2025 WL 80372, at *4 (6th Cir. Jan. 13, 2025) (quotation omitted). When faced with a policy requiring officers to inventory all "articles and property" contained in a car, for example, we interpreted that to "include closed containers" and their contents. *United States v. Hill*, 1990 WL 208767, at *1, *3 (6th Cir.

Dec. 18, 1990); *accord Jackson*, 2025 WL 80372, at *4 (policy requiring search of "vehicle's contents" required opening closed containers in the car). Just so here. The policy for this 800-person village directs officers to "always do a COMPLETE physical inventory of its contents." R.56-8 at 29.

That is in line with our sister circuits. They interpret policies that require a comprehensive inventory of all property to apply to the opening of closed containers. *See Mundy*, 621 F.3d at 290–91; *United States v. Thompson*, 29 F.3d 62, 66 (2d Cir. 1994); *United States v. Wilson*, 938 F.2d 785, 789 (7th Cir. 1991).

The officers in the end fairly construed the policy to require them to open the black tote and inventory its contents. No Fourth Amendment violation occurred.

*Probable cause to arrest Henderson for obstructing official business on September 22.* Henderson next claims that Officer Lawless violated the Fourth Amendment when he arrested Henderson for obstructing the inventory search.

The Fourth Amendment requires officers to have probable cause of a crime to arrest someone. *Ingram v. City of Columbus*, 185 F.3d 579, 592–93 (6th Cir. 1999). The officers arrested Henderson for violating New Holland Ordinance 136.06 by obstructing official business. R.64 at 10. The question, then, is whether Officer Lawless had probable cause to believe that Henderson violated this law. *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). Because the ordinance directly mirrors Ohio Revised Code § 2921.31(A), we may look to our interpretations of § 2921.31 to shed light on the meaning of the ordinance. *Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012).

Under Ohio law, obstruction of official business requires "(1) the performance of an unprivileged act (2) with the purpose of preventing, obstructing or delaying the performance by a public official of an authorized act within his official capacity (3) which hampers or impedes the public official in the performance of his lawful duties." *Patrizi*, 690 F.3d at 464 (quotation omitted). To meet the "unprivileged act" element, an individual must commit an "affirmative act." *Lyons*, 417 F.3d at 573. Simply "doing nothing, such as refusing to provide identification or other information to the police," does not suffice. *Id.* at 574. Someone who "walk[s] towards

[an] officer" who attempts to "keep a 'buffer' between himself and" the individual, on the other hand, commits an affirmative act. *State v. Mahalli*, 2016 WL 936170, at *4 (Ohio Ct. App. Mar. 10, 2016). "[F]ailure to respond to a law enforcement officer's request . . . coupled with loud, boisterous, and uncooperative conduct," also constitutes an affirmative act. *State v. Shoe*, 2018 WL 3621052, at *4 (Ohio Ct. App. July 30, 2018) (quotation omitted).

Gauged by these standards, Officer Lawless had probable cause to believe that Henderson obstructed official business. Henderson, for starters, committed a parade of affirmative obstructive acts. Barely a minute into the interaction, Henderson attempted to close and lock his car to prevent the officers from accessing it for the inventory search. Henderson did not relent once the search began. Even after the officers repeatedly asked Henderson to sit on the sidewalk and away from the car for their safety, Henderson continued to walk toward them as they conducted the inventory search. Throughout, Henderson engaged in loud, boisterous conduct, yelling at the officers that he "d[idn't] have to cooperate" and interrupting their attempts to explain the procedure for the inventory search. R.59 Cell Phone Footage at 2:14–17. These actions satisfied the affirmative act test and count as the performance of an unprivileged act.

The officers had probable cause for the other two elements too. Henderson's own words show that he intended to obstruct the inventory search. His cell phone footage records him repeatedly yelling at the officers and repeatedly trying to stop the search. He forced the officers to spend several minutes corralling him before they could begin the inventory search in earnest, all the while hampering the performance of their lawful duties. All of this suffices to establish probable cause that he obstructed official business.

Henderson insists that the impoundment and inventory search were unlawful and that he had a right to resist them. But as explained above, Officer Lawless's actions complied with the relevant ordinances and the Fourth Amendment.

Henderson points to case law saying that "refusing to comply with an officer's request is not enough" to qualify as an affirmative act under Ohio law. *Jones v. City of Elyria*, 947 F.3d 905, 915 (6th Cir. 2020). But *Jones* stands only for the common-sense proposition that

"simply . . . doing nothing" does not constitute an affirmative act. *Lyons*, 417 F.3d at 574; *see Jones*, 947 F.3d at 915 (pointing to "a suspect's refusal to turn over his driver's license" as an example). Henderson, as his own cell phone footage confirms, did not insist on doing nothing.

Henderson contends that his conduct did not meaningfully hamper or impede the officers' search. In his telling, his actions led to only a "'few seconds' of disagreement." Appellee's Br. 36 (quoting *Smith v. City of Wyoming*, 821 F.3d 697, 716 (6th Cir. 2016)). But Henderson's video shows and tells another story. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). His belligerence and refusal to comply with basic commands led to several minutes of confrontation and delay. He may not now transfigure the incident that he took care to capture on video into something it wasn't. No Fourth Amendment violation occurred.

IV.

Henderson's state-law claim for malicious prosecution also fails. He premises the claim on the criminal charges that prosecutors brought (and later dismissed) after Henderson's arrest on September 22. "Under Ohio law, a malicious-prosecution claim requires: (1) malice in instituting or continuing the prosecution; (2) lack of probable cause; and (3) termination of the prosecution in favor of the accused." *Jones*, 947 F.3d at 921 (quotation omitted). As shown, Officer Lawless had probable cause as a matter of law to arrest Henderson for obstruction of official business. That defeats Henderson's claim.

We reverse.